IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                3:09-CR-00119-BR
                                         (3:12-CV-01375-BR)

                    Plaintiff,

                                         OPINION AND ORDER

v.

RAFAEL ROMERO-DUARTE,

                    Defendant.


**S. AMANDA MARSHALL**
United States Attorney
**THOMAS H. EDMONDS**
Assistant United States Attorney
1000 S.W. Third Avenue
Suite 600
Portland, OR  97204
(503) 727-1000

          Attorneys for Plaintiff

**RONALD D. HOWEN**
P.O. Box 1398
100 North D Street, Suite 123
Lakeview, OR 97630-0054
(541) 947-4752

          Attorney for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Rafel Romero-Duarte's Motion (#367) to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 and Amended Motion (#382) to Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.

For the reasons that follow, the Court **DENIES** Defendant's Motions and **DECLINES** to issue a certificate of appealability.

## BACKGROUND

On April 2, 2009, Defendant was charged in an Indictment with one count of Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and six counts of Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

On April 27, 2009, Francesca Freccero appeared as counsel for Defendant counsel at his arraignment and detention hearing before Magistrate Judge John Acosta.

On May 4, 2009, Samuel Kauffman was appointed as Defendant's counsel.

On May 6, 2009, Defendant was charged in a Superseding Indictment with one count of Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and eight counts of

2 - OPINION AND ORDER

Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

On May 12, 2009, the government made the first of 34 disseminations of discovery to Defendant. The first dissemination included disclosure of 12,913 separately Bates-numbered "pieces of discovery." Some of the individual Bates-numbered pieces of discovery included multiple pages or pieces of evidence.

Also on May 12, 2009, the Court entered a Disclosure Order and Protective Order, which provided in pertinent part:

> IT IS HEREBY ORDERED that the defendants make no disclosure of the . . . search warrants and returns provided by the government. Copies of the search warrants and returns provided to the defendants' attorneys of record in this case may only be shown to the defendants and copies only provided to those persons employed by the attorneys who are necessary to assist counsel of record in preparation for trial. Defense counsel shall not reproduce the search warrants and returns for dissemination to any persons or parties, including the defendant, and shall maintain complete custody and control over them, including all copies. Defense counsel shall return copies of the search warrants and returns to the attorney for the government following the conclusion of the case.

On June 18, 2009, Defendant filed a 16-page Request for Discovery.

On July 1, 2009, the Court held a scheduling conference and declared the case complex.

On July 23, 2009, Kauffman filed a Motion to Withdraw as

3 - OPINION AND ORDER

Defendant's counsel.

On August 7, 2009, the Court held a hearing on Kauffman's

Motion to Withdraw.  At the hearing Kauffman explained he and

Defendant had a number of issues, including Defendant's "lack of

trust . . . of [Kauffman's] approach to the case."  Gov't Resp.

to Am. Mot., Ex. 11 at 3.  In particular, Kauffman noted

Defendant requested printed copies of all of the discovery, which

was not possible due to the volume of discovery and the terms of

the Protective Order.  Kauffman also noted a disagreement with

Defendant "about whether he consented to the setover of the

trial."  *Id.* at 4.  In his Declaration Kauffman testifies, among

other things, that:

> Over the three months that I represented
> Mr. Romero-Duarte, I had received over 16,000
> pages of discovery in digital format.  As I
> recall, that production included numerous
> investigation reports, wiretap transcripts as well
> as audio files.
>
> My general practice in a case with a significant
> volume of discovery, such as this, is to go over
> with the client or read verbatim the most
> important reports and other records with the
> assistance of an interpreter (if the client does
> not speak English), and to provide copies of those
> reports to the client if requested and if
> consistent with the orders of the Court.
>
> In this case, I recall that Mr. Romero-Duarte
> insisted from the outset that I produce to him the
> entire set of discovery in paper form.  It would
> have been extremely costly and time consuming to
> print out every page of discovery given the
> volume.  Further, it would have been virtually
> useless to Mr. Romero-Duarte without an
> interpreter to read it to him in Spanish.

> Finally, the Court had entered a protective order
> prohibiting me from producing copies of the
> wiretap materials to Mr. Romero-Duarte (which, I
> recall, was the bulk of the discovery at that
> time).  Accordingly, I recall telling Mr. Romero-
> Duarte that I was not, at least at that stage of
> the case, able to furnish him an entire set of the
> discovery in paper form.  This conflict regarding
> the discovery was a major obstacle to our
> attorney-client relationship.
>
> Second, Mr. Romero-Duarte alleges that his lawyers
> did not, in lieu of producing the discovery to
> him, read nor have it read to him in Spanish
> . . . .  Mr. Romero-Duarte is correct that I did
> not read the entire discovery to him in Spanish or
> have it read to him.  However, I recall that we
> had begun the process of going over the discovery
> at the time he asked me to withdraw.

Gov't Resp. to Am. Mot., Ex. 37 at ¶¶ 6-9.

The Court spoke to Defendant directly and explained the
Court rather than Kauffman had made the decision to postpone the
trial date because Defendant was "one of several defendants, and
[the Court has] the responsibility of balancing all of the issues
the lawyers have been talking about concerning their ability to
be ready or not."  Gov't Resp. to Am. Mot., Ex. 11 at 6.  The
Court advised Defendant that he could "separate himself" from the
other defendants and try to move his case towards trial more
quickly, but advised Defendant would "then . . . likely give up
any chance to keep out wiretap evidence that could be used
against you."  *Id*.  The Court also explained:

> [I]t is my order that the lawyers not provide
> printed copies of the discovery.  That is my
> order, and it's not your lawyer's decision.  The
> lawyers have to work with their clients to

5 - OPINION AND ORDER

determine a reasonable way for you to understand what evidence the Government has. But I am not willing, at present, to allow copies of that material out into the various facilities where the defendants are being held. There are too many issues there.

So your lawyers have full access to the material. Everybody is working through the material. I know it's harder because you're in custody. I know it's harder because you and your lawyer don't speak the same primary language. This is the way it has to be, and we need to work around those obstacles to ensure you have a meaningful understanding of what evidence the Government wants to use against you and what your lawyer can do to try to meet that evidence.

Gov't Resp. to Am. Mot., Ex. 11 at 8-9. The Court noted:

If you think there are problems that -- in your relationship with your lawyer that will interfere with your case going forward, I'm not unwilling to appoint a new lawyer. But what I need you to understand is I do not want to see you and Mr. Conry here in a month with this kind of same problem, because there are only so many lawyers I'm willing to put in line. In other words, this is not a process where you don't like one and we get another, and you don't like that one and we get a third. We need to be sure you are in good working relationships with your lawyer.

We need to be sure you understand what you're facing. And you need to make choices that your lawyer can help attempt to make happen. But the lawyer is not a magician. The lawyer can't change what you're facing. The lawyer isn't just -- in charge of the process. There are many other factors the judge -- I have to manage.

Gov't Resp. to Am. Mot., Ex. 11 at 7-8.

Ultimately the Court granted Kauffman's Motion to Withdraw. Defendant, however, refused to allow Kauffman to speak with newly appointed counsel, Brian Conry. Defendant also inquired of the

6 - OPINION AND ORDER

Court whether Conry was going "to give [Defendant his]
discovery."  The Court explained Conry was subject to the same
Protective Order that prevented Kauffman from giving Defendant
copies of all of the discovery in this matter.  Defendant then
stated:  "[T]hey cannot give me a speedy trial?"  Gov't Resp. to
Am. Mot., Ex. 10 at 9.  The Court explained it had made

> a finding that the Speedy Trial Act does not apply
> to require any earlier date than next June because
> this is a complex case and there are many issues
> the Court and many lawyers and parties must
> resolve in an efficient way to achieve justice for
> everyone.  That is my finding.  It is not your
> lawyer's responsibility.
>
> This is the order of the Court.  Discuss it with
> your new attorney.  If you have a new issue or a
> new reason for me to reconsider that issue, I will
> do so.

*Id.*

On August 28, 2009, Conry filed a Motion to Withdraw as
Defendant's counsel.

On September 11, 2009, the Court held a hearing on Conry's
Motion to Withdraw.  At the hearing Defendant expressed his
feeling that Conry was "disrespecting" him because Conry refused
to file a motion to allow Defendant to "get [his] discovery."
Gov't Resp. to Am. Mot., Ex. 13 at 9.  The Court again explained:

> I have issued an order requiring that none -- you
> need to listen to me.  And if this is an example
> of the way the communication goes with the lawyer,
> I can see the problem.  You need to wait and
> listen.
>
> Look at me, please.

7 - OPINION AND ORDER

I have issued an order that prohibits the
attorneys from handing  the papers over to the
clients.  It is not his choice.  It is mine.  I
have made that decision because of risks I see to
the safety of certain people if this information
is out and available.  The lawyers have complete
access to the discovery the lawyers will report to
the clients about what the information is and what
needs to be resolved.

But if this problem you have with him is about
your not having the papers, that's on me, not him.
He doesn't have the power to give it to you.

Gov't Resp. to Am. Mot., Ex. 13 at 10.  Defendant asked if the

Court could appoint someone "more courteous."  The Court then had

the following exchange with Defendant:

[THE COURT]:  My problem here, sir, is that
you've now had two lawyers that you've told me you
can't get along with.

    Mr. Kauffman is a perfectly courteous man.
I know Mr. Conry to be an extraordinarily
experienced and personable individual.

    If I appoint a third lawyer, this man behind
you, and you tell me he's not nice either, I'm
going to think the problem is yours, instead of
the lawyers'.

    Do you see my -- do you see what I'm saying?

THE DEFENDANT THROUGH THE INTERPRETER:  Yes.  But
can we find a way to fight about my discovery,
because I really need to take a good look at it
because it's my life.

THE COURT:    You certainly need to know what is
in the discovery.  But if you start -- if you
start with another lawyer by insisting on the
paper, that's a nonstarter.  That's my decision,
not the lawyer's.

    I've told you this at the last hearing.
That's not that's not the way this is going to

happen.  You're going to need to get the discovery explained by your lawyer, but you will not have those papers in your hands.  You will not have them in the jail with you.  I've made an order there, and there is good reason to protect people for that to occur.

That means you have to work all the harder to speak with your lawyer, to sit down and communicate in real terms.  You can't shut the lawyer out and say, You're not doing it my way, so I'm not going to play.  That just can't work.  The only way this will work, sir, is if you communicate with the lawyer.

Now, if you want someone who will treat you with respect -- and I don't in any way accept as fact that Mr. Conry did not.  But I also don't think there's any use in my trying to fight that battle.

You need to commit to treating the lawyer with respect.

* * *

But there has to be a way for the lawyer and you to communicate.

Gov't Resp. to Am. Mot., Ex. 13 at 12-13.  Defendant expressed his belief that "[the trial] was set out without my authorization, and I think my rights are being violated."  *Id*. at 13.  The Court noted "it is not reasonable to force a case to trial when there isn't even a working lawyer's relationship here; because you have not gotten along with two lawyers."  *Id*.  The Court pointed out that Defendant's refusal to allow Conry to communicate with Kauffman had slowed the process.  Defendant stated:  "I can't have a speedy trial?"  To which the Court responded:

9 - OPINION AND ORDER

> I am giving you a speedy trial.  But I'm telling
> you that a speedy trial means one in which the
> lawyer representing the party has had enough time
> professionally to assess the risk, to investigate
> options, and fully to inform the client.  You
> cannot go to trial without an adequate
> investigation and preparation.  I would not allow
> you to plead guilty to these charges without
> adequate advice from a lawyer who knows the whole
> file.

Gov't Resp. to Am. Mot., Ex. 13 at 15.  The Court appointed

Defendant new counsel, Ernest Warren, Jr., and asked whether

Defendant would allow Conry to speak with Warren.  Defendant said

"no," at which point the Court advised Defendant:  "This lawyer

is going to tell me he can't even be ready for trial in June, if

he has to start over today.  So you need to understand that for

every barrier you put in the way of the new lawyer, it takes

longer." *Id*. at 16.  Defendant expressed surprise and dismay

that his trial was set in June asking:  "It can't be advanced?

Made earlier?" *Id*.  The Court explained the trial date had been

set for months and that the other defendants had moved forward.

Defendant's own actions had slowed his progress in this matter.

The Court noted:  "It's contradictory to say you want a lawyer to

have your case ready quickly and then to tie your lawyer's hands

and not let him speak with your earlier lawyers.  That's your

choice.  But don't complain to me about time.  That's your

choice." Gov't Resp. to Am. Mot., Ex. 13 at 17.

On September 17, 2009, Defendant filed a Motion for Hearing

to Allow Defendant to Review Discovery under Terms, Conditions

10 - OPINION AND ORDER

and Restrictions to be Set by This Court.  Warren testified by an Affidavit in Support of the Motion that Defendant "desires to personally review the discovery against him to prepare a defense to the charges against him."  Also in September 2009 Defendant filed a Request for Production and a Second Request for Production.

On September 28, 2009, the Court held hearing on Defendant's Motion for Hearing and reiterated its ruling that Defendant is not permitted to retain discovery in his possession while he is in custody.  The Court, however, inquired whether it could do anything to facilitate or to make less burdensome the process by which material could be reviewed with Defendant.  Warren articulated a number of difficulties that he encountered while attempting to review discovery with Defendant at the Columbia County Jail where Defendant was housed at the time of the hearing.  Accordingly, the Court asked the United States Marshal to facilitate through the Bureau of Prisons a change in Defendant's place of custody to a facility in which contact visits are permitted to allow Defendant to conduct an in-person review of documents with counsel.

Subsequently Defendant was transferred to Multnomah County facilities and Warren did not report any further difficulties.

In October and November 2009 Defendant filed Third and Fourth Requests for Production.

11 - OPINION AND ORDER

In December 2009 Defendant filed several Motions to Suppress, Motions to Compel Disclosure of Identities, a Motion to Expedite Trial Date, and a Motion to Sever.

On December 29, 2009, Magistrate Judge Paul Papak conducted a settlement conference, but the matter did not settle.

On January 26, 2010, the Court heard oral argument on Defendant's Motions to Suppress, Motions to Compel, Motion to Expedite Trial, and Motion to Sever and issued an Order denying Defendant's Motions.

In February and March 2010 Defendant filed a Motion for Grand Jury Transcript, two Motions to Suppress, a Sixth Request for Production, and a Motion to Dismiss on the grounds of the Speedy Trial Act.

On March 29, 2010, the Court heard oral argument on Defendant's Motion to Dismiss.  At oral argument Warren told the Court that he had advised Defendant that the Speedy Trial Act was not being violated due to the complex nature of the matter but Defendant "is under the impression that, no matter what, his speedy trial rights are violated if he doesn't have a trial within . . . one year . . . from the anniversary of his arrest date."  Gov't Resp. to Am. Mot., Ex. 29 at 5.  The Court noted it had already "made findings of excludable delay, based on the record as it existed . . . .  I'm not going to read those again into the record. . . .  I don't have any basis, factually or

legally, to be concerned here about a speedy trial violation."
*Id*. at 8.  The Court denied Defendant's Motion.

On April 6, 2010, the Court heard oral argument on
Defendant's Motion to Suppress.  At the hearing Warren advised
the Court that Defendant had requested Warren to withdraw as
defense counsel.  Warren explained he had

> basically fought [Defendant] the whole way to try
> to represent with him.  And . . . I don't mean
> physically but -- mentally and emotionally, to try
> to get him to understand what his rights are, what
> this voluminous amount of evidence says, and -- to
> try to build trust in him that I will fight as
> hard as I possibly can for him.
>
> * * *
>
> No matter what I do, [Defendant] doesn't accept
> that I'm doing the best that I can for him; nor
> does he appreciate it.  And one of the problems
> that I -- over the many times that I've
> communicated with him and over the numerous hours
> probably, by now, over hundreds of hours have sat
> and communicated, reviewed evidence, and that we
> and the like, the communication is one-way.  It's
> as if the listening from [Defendant's] end is
> turned off.  And he's --he's a monodrome
> (phonetic), where he comes forward with this same
> conversation again and again and again.

Gov't Resp. to Am. Mot., Ex. 30 at 3, 4.  The Court asked Warren
whether he was concerned about Defendant's mental capacity or if
Warren had concluded it was "a willing refusal to engage."  *Id*.
at 4.  Warren responded it was his conclusion that it was a
"willing refusal."  Warren explained:

> And so we've had this -- this acrimonious play.
> And I've listened, and I've listened to the
> putdowns.  I think I can take that.  But what I

13 - OPINION AND ORDER

can't take is that when I try to . . . communicate
in response my best advice, and I show him the law
again and again and again -- I show it to him in
Spanish.  I show  it to him in English.  I show it
to him in writing.  The phone calls from -- from
jailhouse lawyers, that -- that I take.  And I
tell them, Don't talk to my client about this
case.  And I -- I tell my client, Don't talk to
them about your case, because they could turn up
and be a witness against you for chicken change
. . . in this courtroom.  I don't think that it's
listened to.  I don't think that it's appreciated.
And for whatever reason, because of my collegial
relationship with the Government counsel . . .
[Defendant] feels that he has just cause to stand
up and speak to this Court today and say that I'm
not fighting in his best interest.  And I believe
that that's a communication breakdown.  And . . .
I would rather withdraw than go on and try to
fight and convince this man of what his rights are
and how hard we're fighting for his rights.

One of the issues is the stipulation, for example,
today that we've entered into with this Court that
would totally protect him in every respect. . . .
He thought that that was some scheme by me to get
him convicted, when it's quite the opposite.

Gov't Resp. to Am. Mot., Ex. 30 at 6-7.  The Court expressed

concerns about allowing Warren to withdraw and to appoint new

counsel and engaged in the following exchange with Defendant:

THE COURT:    If you succeed in persuading me to
allow this lawyer to withdraw, your case will not
go to trial on June 14.  It will have to be
continued again, because there is not any way a
response a responsible attorney could be ready to
proceed in the time that remains between now and
then.

So before I undertake an analysis of whether
I should or should not grant a new lawyer at this
stage, do you agree your case may be continued by
me for another four to six months to allow a new
attorney to come up to speed? Yes or no?

14 - OPINION AND ORDER

Sir, answer my question.  Yes or no?

* * *

THE INTERPRETER:    No. I don't want my -- I don't want my trial to be reset again.  I've been waiting for a whole year.

THE COURT:     All right. Let me ask you this question.  If the choice is between going to trial on June 14 or a new attorney, which is your choice?

THE INTERPRETER:    I need another attorney who is not this attorney.

THE COURT:     Sir, answer my question.  If I conclude your motion, if granted, requires me to change the trial date, would you rather go to trial on June 14 with Mr. Warren, or would you rather have a new lawyer and have a new trial date but some time several months in the future?

THE INTERPRETER:    I -- I don't accept that my case be reset, and I need another attorney.

THE COURT:     I disagree with you, but I'm going to ask you the question one more time.  I'm going to ask you the question one more time, and give you an opportunity to express your opinion.

If I conclude that allowing a new lawyer into the case requires me to continue the trial date, do you want a new lawyer and a new  trial date in several months?  Or do you want to continue with this lawyer and have trial on June 14?

If I conclude you cannot have both a new lawyer and the June 14 trial date, what is your choice?

THE INTERPRETER:    My -- my decision is to not . . .have my trial reset and to have a new attorney.

THE COURT:     Yes, I don't believe that's a reasonable option available to you.

15 - OPINION AND ORDER

THE INTERPRETER:    I want a new attorney. I need
a new attorney assigned to me, and I do not -- I
do not authorize for this new trial to happen.  I
do not consent to that.

THE COURT:    And I'm saying to you, sir, as the
Court in control of the case, I am certain it is
not possible for me to have a new lawyer to
represent you and to maintain your June 14 trial
date.

      If you do not wish to express an opinion, a
preference between a new lawyer and a new trial
date, that's fine.  Don't.  But I am going -- I am
going to keep this case on for trial, in light of
your insistence.  And that may mean you will not
get a new lawyer.  I need you to understand me
clearly.  It is not your choice.  It is this
Court's responsibility.  You are not --

THE INTERPRETER:    Well, I need a new -- I need
another attorney.

THE COURT:    And if you get another attorney,
sir, your case will not go to trial on June 14th.
I can promise you that.

THE INTERPRETER:    I have the right to another
attorney, and you have to give me another
attorney.  I don't want --

THE COURT:    You do not have the right to
another attorney.

      You have a right to an attorney --

      Sir.  Sir.  You must show this Court respect
enough to let me finish the statement I am making.

      What you have is a right to an attorney.

      An attorney the Court chooses.  And if you –

THE INTERPRETER:    Yes, but I'm not in agreement
with this attorney, and I need I need an attorney
who will help me, because he is in-- he's in
agreement with the prosecutor, and I need one to
help me.

16 – OPINION AND ORDER

THE COURT:     Well, you're -- you're fantasizing.
That's absolute fantasy.  There is not any basis
in fact to that -- sir.  Sir.  You must listen to
me.  Were you not trained, at least as a child, to
show respect to those in authority, and allow a
person to finish a sentence before you interrupt?
Were you not at least given that basic education?

THE INTERPRETER:     Yes, I do have respect.

THE COURT:     Then, please, let me finish before
you interrupt me.

    If this is an example of how you deal with
your attorney, I can understand why he's having
difficulty.  If you do not show him the respect to
allow him to give you the advice he thinks you
need to hear, I can understand why there's a
problem.  But the problem, sir, is not with the
lawyer.  It's with you.  And bringing yet another
lawyer in to represent you won't change that.

    Here is what you need to hear from me.

    There is not any way I will grant this motion
if you expect a new lawyer to be able to be ready
to try your case on June 14th.  That is not
possible.  And I am giving you one last
opportunity to express to me a preference.

*Id*. at 12-15.  Defendant continued to refuse to express a

preference.  Later in the hearing the Court found Warren had

worked "diligently on the defendant's behalf for months, and has

brought more motions in this case than I've seen brought in any

recent case of comparable concern."  *Id*. at 18-19.  The Court

rejected Defendant's complaints related to (1) insufficient

motions, (2) "working with the prosecutor," (3) insufficient

access to discovery, and (4) "selling defendant out to the

prosecutor."  *Id*. at 19.  The Court wondered "whether

17 - OPINION AND ORDER

[Defendant's] intention is to bum through lawyer after lawyer after lawyer in hopes that somehow he can create some record for an appellate court that his obstructionism is not itself the reason the case has been delayed, I don't know." *Id*. at 20.  The Court noted:

> If [Defendant is] willing to be as disrespectful
> to his lawyers as he is to the Court, when he
> wants something, I can't imagine what kind of
> problem he repeatedly presents for his lawyer.  If
> he does not want to accept advice, if he does not
> want to hear, there is not a thing a new lawyer
> can do about that.  Mr. Romero-Duarte has the
> constitutional right to the effective assistance
> of a lawyer.  If his own obstructionism is what's
> interfering with that, that is not a matter a new
> lawyer can cure.  And so I'm not at all optimistic
> that bringing in a new lawyer here is going to
> change anything.

*Id*. at 21.  Warren predicted further problems with Defendant if he was required to continue as counsel based on his history with Defendant.  With respect to Defendant's assertion that he did not understand the charges against him, Warren advised the Court that Defendant had been given a copy of the Indictment in English and translated into Spanish.  Warren advised the Court that the same thing had been done with all of the motions that Warren had filed on Defendant's behalf.  The Court also instructed Defendant in considerable detail as to the elements of each of the charges against him in the Indictment as well as the law of conspiracy.  *Id*. at 9-12.  The Court informed Defendant about the two counts in the Indictment with which he faced a maximum penalty of life

imprisonment.  *Id.* at 13.

On April 7, 2010, Defendant was charged in a Second Superseding Indictment with one count of Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), two counts of Distribution of Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and one count of Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

On April 19, 2010, the Court arraigned Defendant on the Second Superseding Indictment.  The prosecutor read the Second Superseding Indictment aloud.  At the hearing Defendant stated several times that he did not want to be "present in court" and insisted he needed a new attorney.  Defendant asserted he did not understand his rights.  The Court appointed attorney Lynne Morgan to confer with Defendant regarding substitution of counsel.  The Court then held *ex parte* proceedings with Defendant to discuss the issue of representation.  Morgan advised the Court that she had spent several hours meeting with Warren reviewing roughly 300 pages of discovery, search warrant and wiretap materials, and the government's pleadings.  Morgan stated she had also reviewed defense pleadings "with an eye towards reviewing Mr. Warren's work in the case."  Gov't Resp. to Am. Mot., Ex. 33 at 3-4. Morgan noted she met with Defendant, who continued to be adamant

19 - OPINION AND ORDER

about getting a new attorney who spoke Spanish.

The Court asked Morgan whether in her review of the case she had identified any failure by Warren in conducting his duties. Morgan replied she had not identified any failure. The Court then asked Morgan her opinion about the feasibility of a new lawyer being prepared for trial on June 14, 2010. Morgan stated unequivocally that more time would be necessary for a new attorney to be prepared. The Court then advised Defendant that if the Court appointed new counsel, the trial date would have to be extended to allow that attorney an adequate amount of time to prepare. Defendant insisted once again that he wanted new counsel, but did not want an extension of his trial date.

Defendant advised the Court that he would not accept Morgan as new counsel because she had spoken with Warren. Defendant asked the Court to "pick the attorney, right now, here in front of me, to decide, you know, who's going to represent me." Gov't Resp. to Am. Mot., Ex. 33 at 16. The Court explained once again the untenability of Defendant's assertion that he wanted new counsel who would not speak with prior counsel and of Defendant's desire for his case to go to trial on June 14, 2010. Defendant then returned to the issue of having copies of all of the discovery in his possession, which the Court, as noted, had addressed previously on numerous occasions. The Court pointed out that:

20 - OPINION AND ORDER

There is not one thing Mr. Warren has done that is
not correct.  He has in fact proceeded with
eminent competence here.  You are not going to get
physical possession of the discovery.  There isn't
any lawyer in this country who will change that.

* * *

[T]he work that's been done to this point has been
done correctly.  You are fantasizing when you
assume otherwise.

So do not expect that a new lawyer will do things
differently, because this lawyer has done them
correctly.  There isn't any other way to do what
needed to be done.

A new lawyer will not succeed in getting you
possession of the discovery.  That's just not
going to happen.

So you keep coming back to the same issues that
I've ruled on, and you must accept that, as the
judge, I make the rulings.

Gov't Resp. to Am. Mot., Ex. 33 at 19-20.

Ultimately the Court concluded there had been a "complete
breakdown of the attorney-client relationship" between Warren and
Defendant, and, therefore, the Court granted Warren's Motion to
Withdraw.  The Court noted it would confer with the Federal
Public Defender's Office to identify a new attorney for
Defendant.

On May 10, 2010, the Court conducted a scheduling
conference.  Attorney John Kolego appeared on behalf of
Defendant.  Defendant advised the Court that he did not have any
opposition of Kolego speaking with Warren and receiving all of
Defendant's file materials from Warren.  Defendant did not make

21 - OPINION AND ORDER

any complaints about Kolego until Defendant filed his Motion to

Vacate.

In his Affidavit Kolego testifies in pertinent part:

> [Defendant] did not receive physical copies of all
> or most of the Rule 16, Jencks Act and <u>Brady</u>
> documents, but on numerous occasions I brought all
> of the case materials to [Defendant] and with the
> aid of certified interpreter Guillermo Chamorro
> allowed [Defendant] to inspect any of the
> materials that he wanted to.  Additionally, the
> plea agreements were translated to [Defendant] in
> Spanish by Mr. Chamorro and with the aid of
> Mr. Chamorro I discussed the relevant sentencing
> guidelines application and explained the perils of
> trial with respect to possible sentences.

> * * *

> [Defendant] was provided access to transcripts of
> all wiretap tapes and given the opportunity to
> review them with the aid of an interpreter.
> [Defendant] never asked to listen to the
> tape-recordings themselves, however if he had
> requested to listen to them, I would have made
> arrangements for him to do so.

> * * *

> I met with [Defendant] many times and felt that he
> and I had a working relationship and that I had an
> understanding of his background and education.
> With respect to [Defendant] having understanding
> deficits with regard to legal terms used in his
> case as well as the criminal justice system in the
> United States I attempted to explain relevant
> concepts to [Defendant] with the use of a
> certified interpreter.  [Defendant] clearly
> understood the concepts of the presumption of
> innocence and that the government bore the entire
> burden of  proof in the case.

> * * *

> I spoke with [Defendant] about prospective defense
> witnesses and he never asked me to subpoena or

interview any witnesses. [Defendant] told me that it was his understanding that he had no burden of proof, was presumed to be innocent and that he did not believe the witnesses against him were credible.

There was a continuing demand for discovery when I was retained in [Defendant's] case and am not aware of any exculpatory or impeaching evidence that was not provided for the defense.

Finally, the decision as to whether to testify or not rests with the client. . . . I inform all defendants that the decision as to whether to testify or not is theirs and offer my opinion as to whether or not it is a good idea. In [Defendant]'s case I felt that subjecting himself to extensive cross-examination was probably not in his best interest but had [Defendant] wished to testify he certainly could have.

Gov't Resp. to Am. Mot., Ex. 35 at 1-2.

On September 27 through October 5, 2010, Defendant's case proceeded to trial on all four counts of the Second Superseding Indictment. At trial several cooperating witnesses testified against Defendant under oath and were cross-examined about Defendant's role in the conspiracy, his participation in the substantive charged offenses, the drug quantities that were involved in the charges at issue, Defendant's return to the United States in late fall 2008 to take over the organization, Defendant's recorded telephone calls demonstrating his role as a leader and organizer of the drug organization's sales activity, and Defendant's acquisition and maintenance of various living apartments and "stash houses." Defendant decided not to testify at trial, and the Court engaged Defendant in a detailed colloquy

23 - OPINION AND ORDER

to advise Defendant of his right to remain silent and to determine Defendant's decision was well-considered.

On October 5, 2010, the jury rendered a Verdict finding Defendant guilty on all counts.

On December 21, 2010, the Court sentenced Defendant to a term of 25 years imprisonment on each count, each sentence to run concurrently.

Defendant appealed his conviction and sentence.  On June 11, 2012, the Ninth Circuit affirmed Defendant's conviction and sentence.

On July 30, 2012, Defendant filed a *pro se* Motion to Vacate or Correct Sentence under 28 U.S.C. § 2255 in which he alleged Kolego failed to advise him

> about the actual consequences of rejecting the
> plea bargain.  He told me that the offer was for
> 14 years, and that if I elected to go to trial,
> that I faced no more than the 14 years offered in
> the plea bargain.  I elected to go to trial and
> received a 25-year sentence.  This far exceeded
> what my attorney told me I would be subject to if
> I elected to go to trial in lieu of taking the
> plea bargain.

Def.'s Mot. to Vacate at 5.

On September 19, 2012, the Court appointed Ronald Howen as defense counsel for purposes of Defendant's § 2255 Motion.

On December 11, 2012, Defendant filed an Amended Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC 2255 in

24 - OPINION AND ORDER

which Defendant alleged all of the attorneys[1] who represented him from arraignment through trial failed to provide him with adequate representation.

On July 11, 2013, the Court took this matter under advisement.

## STANDARDS

28 U.S.C. § 2255 provides in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.
>
>                * * *
>
> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

---

[1] The record reflects Freccero was defense counsel for only eight days and appeared only at Defendant's First Appearance and Arraignment.  None of Defendant's specific allegations relate to any actions or lack of action by Freccero.

Although "the remedy [under § 2255] is . . . comprehensive, it does not encompass all claimed errors in conviction and sentencing. . . .  Unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack [under § 2255] has remained far more limited." *United States v. Addonizio*, 442 U.S. 178, 185 (1979).

## DISCUSSION

Defendant moves to vacate or to set aside his sentence on the ground of ineffective assistance of counsel.  Specifically, Defendant contends all counsel

1.  did not physically provide Defendant with all of the discovery in a language or format that he could understand;

2.  did not provide him with plea agreements in writing, in Spanish, or in another format he could understand;

3.  failed to adequately explain "the concepts of his criminal liability pursuant to a drug conspiracy theory, and/or how the Federal Sentencing Guidelines would impact him by refusing a plea agreement" with reference to his liability under a conspiracy theory and his supervisory role;

4.  did not afford him an opportunity to listen to all of the wiretap tapes that were in Spanish;

26 – OPINION AND ORDER

5.   spent insufficient time with him "personally to get to
     know him as a person"; and

6.   failed to file written pretrial motions for discovery.

Defendant also alleges Kolego:

1.   failed to advise Defendant about the actual
     consequences of rejecting the plea bargain;

2.   did not properly or adequately investigate or prepare
     Defendant's case for trial;

3.   did not subpoena or otherwise interview witnesses
     requested by Defendant; and

4.   "told Defendant not to take the witness stand and
     testify at either trial or at sentencing even as
     [Defendant] wanted to do in order to explain his
     limited role in the over-all drug conspiracy and that
     he was not, in fact or at law, a leader or organizer of
     the drug conspiracy whereas one of his co-defendants
     was far more culpable as a leader or organizer."

Defendant alleges the government

1.   failed to make a timely written disclosure or statement
     to the Court and defense counsel of the contents of
     their files and the files of investigating agencies
     with regards to Rule 16, the Jencks Act, and *Brady*
     documents and

2.   failed to disclose the overall extent of the drug

conspiracy and the roles of the other leaders and
supervisors in order to rebut that Defendant should
have "a four or more level enhancement as a leader or
organizer."

**I.  Standards**

The Supreme Court has established a two-part test to
determine whether a defendant has received constitutionally
deficient assistance of counsel. *Strickland v. Washington*, 466
U.S. 668, 678, 687 (1984).  Under this test a defendant must not
only prove counsel's assistance was deficient, but also that the
deficient performance prejudiced the defense. *Id*. *See also*
*Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994); *Campbell v.*
*Wood*, 18 F.3d 662, 673 (9th Cir. 1994)(*en banc*); *Mak v. Blodgett*,
970 F.2d 614, 618 (9th Cir. 1992).

"To prove deficiency of performance, the defendant must show
counsel made errors so serious that performance fell below an
objective standard of reasonableness under prevailing
professional norms." *Mak*, 970 F.2d at 618 (citing *Strickland*,
466 U.S. at 687-88)).  The court must inquire "whether counsel's
assistance was reasonable considering all the circumstances" at
the time of the assistance. *Strickland*, 466 U.S. at 688.  There
is a strong presumption that counsel's assistance was adequate.
*Id.* at 689.

To prove prejudice "[t]he defendant must show that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  *See also United States v. McMullen*, 98 F.3d 1155, 1157 (9th Cir. 1996).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 695.

The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

## II. Alleged failure to provide Defendant with physical possession of the discovery

As noted, Defendant contends counsel was ineffective because they failed to provide Defendant with physical possession of the discovery in this matter.  The record reflects, however, that the Court explained to Defendant numerous times and in great detail that a Protective Order was in place that prohibited counsel from providing Defendant with physical possession of discovery.  The Court advised Defendant several times that it would not reconsider the Protective Order or permit Defendant to retain discovery while in jail.  In addition, the record reflects the discovery in this matter was comprised of close to 20,000 Bates-numbered pieces of discovery.  Physical retention by Defendant of that amount of discovery while in jail was impracticable.

29 - OPINION AND ORDER

Finally, the Declarations of Defendant's attorneys make clear they spent hours of time with Defendant reviewing discovery with him through interpreters.

On this record the Court concludes Defendant's counsel did not render ineffective assistance with respect to the physical possession of discovery or Defendant's review of the discovery in this matter.

**III. Alleged failure by counsel related to the plea offers.**

Defendant asserts three ways in which counsel was allegedly ineffective relating to the two plea offers made in this matter: (1) Warren failed to provide Defendant with the November 13, 2009, plea offer in writing and/or in Spanish, (2) Warren failed to thoroughly counsel Defendant about the conspiracy charge or the effect of the guidelines if Defendant rejected the plea offer, and (3) Kolego failed to advise Defendant about the actual consequences of rejecting the July 20, 2010, plea offer.

> **A.   Warren's representation related to the November 13, 2009, plea offer**

Warren testifies in his Declaration that Defendant

>> was read all plea agreements in Spanish.  Also, the United States guidelines and calculations were explained to him in Spanish, and he knowingly and intelligently asked questions regarding these matters.  Also, the concepts of criminal liability pursuant to drug conspiracy theory were meticulously explained to [Defendant], including demonstrating for him the audio-recordings of coconspirators and him were compelling evidence of conspiracy.  Additionally, [Defendant's] leadership role and how it helps his criminal

>liability was meticulously explained to him as
>well as the consequences of rejecting the plea
>offer and going to trial.

Gov't Resp. to Am. Mot., Ex. 36 at ¶ 3.  In addition, Warren

scheduled and conducted a settlement conference before Magistrate

Judge Papak.  "During this conference, [Defendant] asked

intelligent questions about the plea offer and plea bargaining.

For all formal and informal meetings, a state and federal

certified interpreter was present."  *Id*. at ¶ 5.  Finally,

Magistrate Judge Papak testifies in his Declaration that although

he is not willing to discuss the specifics of the settlement

conference without Defendant's permission, it is his practice in

every criminal settlement conference to

>review with the defendant the options available to
>him in his case including, trial, the government's
>plea offer and an open plea.  As to each option, I
>identify the benefits and risks, discuss
>sentencing upon an adjudication of guilt,
>including the impact of mandatory minimums and
>guideline calculations.

>* * *

>Throughout the settlement conference, it is my
>goal that the defendant fully understand his
>rights and his options going forward, along with
>the potential benefits and risks of each option.
>I believe [Defendant] fully understood his rights
>and options, including the possible consequences
>of those options, in this case.

Gov't Resp. to Am. Mot., Ex. 38 at ¶ 6-7.

        Defendant's claim is further belied by the fact that at

the April 6, 2010, hearing the Court noted "the record has . . .

31 - OPINION AND ORDER

been established that Spanish-language versions [of the
Superseding Indictment] were provided.  At least it's been
established by Mr. Warren, with respect to" Defendant.  Gov't
Resp. to Am. Mot., Ex. 31 at 9.  The Court then also proceeded to
explain to Defendant at length the charges in the Superseding
Indictment, including the conspiracy charge.  *Id.* at 9-12.

On this record the Court concludes Warren did not
provide ineffective assistance of counsel with respect to the
November 13, 2009, plea offer, his advice related to the
conspiracy charge, or the possible impact of the Sentencing
Guidelines if Defendant refused to accept the plea offer.

### B.   Kolego's representation related to the July 20, 2010, plea offer

Defendant alleges in his Amended Motion to Vacate:

> [Kolego] failed to advise me about the actual
> consequences of rejecting the plea bargain.  He
> told me the offer was for 14 years, and that if I
> elected to go to trial, that I faced no more than
> 14 years offered in the plea bargain.  I elected
> to go to trial and received a 25-year sentence.
> This far exceeded what my attorney told me I would
> be subject to if I elected to go to trial in lieu
> of taking the plea bargain.

At the April 19, 2010, arraignment on the Second
Superseding Indictment "in light of the last proceedings
concerning assertions that at least [Defendant] did not
understand the nature of the charges and the maximum penalties to
which he might be exposed," the Court asked the government to
read the Second Superseding Indictment aloud and to set out the

32 - OPINION AND ORDER

maximum penalties for each of the charges.  Gov't Resp. to Mot.,
Ex. 1 at 3.  In addition, on May 6, 2010, the Court issued
*Faretta* Warnings to Defendant in which the Court explained the
charges against Defendant, set out the elements of each charge,
and noted the maximum and minimum penalties that applied to each
charge if Defendant was convicted.  Gov't Resp. to Mot., Ex. 2 at
6-17.  The Court's *Faretta* Warnings  were provided to Defendant
in writing in both English and Spanish.  Gov't Resp. to Mot., Ex.
2.

> Kolego testifies in his Affidavit that he
>
>> reviewed the government's plea letter of July 20,
>> 2010 with [Defendant] with the assistance of
>> Spanish language interpreter, Guillermo Chamorro,
>> and informed [Defendant] of the government's offer
>> of a recommendation of 180 months with [Defendant]
>> free to argue for less based on the factors
>> enumerated in 18 U.S.C. 3553(a).  I further
>> informed [Defendant] that if he went to trial and
>> was convicted he faced a possibility of at least a
>> level 36 Federal Guidelines advisory sentence
>> range of 188 to 235 months and that if he was
>> found to be an organizer or leader of more than
>> five persons pursuant to the provisions of
>> U.S.S.G. § 3B1.1, he could be looking at an
>> advisory guidelines range increase of four levels
>> (rather than two level increase in the letter) and
>> an advisory sentencing guidelines range of 292 to
>> 365 months.
>>
>> [Defendant] was dismissive of the offer and
>> informed me that he was innocent of the charges,
>> that the witnesses against him were criminals who
>> would not be credible and that he wanted a jury
>> trial.

Gov't Resp. to Mot., Ex. 3 at 1.

> On this record the Court concludes Kolego did not

33 - OPINION AND ORDER

provide ineffective assistance of counsel with respect to the
consequences of rejecting the July 20, 2010, plea offer.

**IV.  Alleged failure to afford Defendant the opportunity to
listen to the wiretap tapes that were in Spanish**

Defendant alleges he received ineffective assistance when
counsel did not afford him the opportunity to listen to all of
the wiretaps that were in Spanish.

The record reflects there were approximately 11,500 audio
recordings in this matter, most of which were derived from months
of a wiretap investigation.  Warren testifies in his Declaration
that he spent approximately 100 hours with Defendant.  During
some of Warren's visits he

> would play wiretap recordings of [Defendant] and
> [Defendant] would deny that he was the speaker.
> My investigator had prepared a way to access all
> calls in which [Defendant] was alleged to be
> speaking, and he would always deny that it was him
> speaking.

Gov't Resp. to Am. Mot., Ex. 36 at ¶ 6.  Warren detailed his
efforts to represent Defendant with respect to this matter at the
April 6, 2010, hearing on Warren's Motion to Withdraw.

Kolego testifies in his Declaration that Defendant

> was provided access to transcripts of all wiretap
> tapes and given the opportunity to review them
> with the aid of an interpreter.  [Defendant] never
> asked to listen to the tape-recordings themselves,
> however if he had requested to listed to them, I
> would have made arrangements for him to do so.

Gov't Resp. to Am. Mot., Ex. 35 at 1.

On this record the Court concludes Defendant has not

34 - OPINION AND ORDER

established counsel failed to afford him the opportunity to listen to all of the wiretaps that were in Spanish or that he received ineffective assistance of counsel on that basis.

**V.   Alleged failure to spend adequate time with Defendant.**

Defendant asserts he received ineffective assistance because his attorneys failed to spend sufficient time with him "to get to know him as a person."

The record reflects Defendant's attorneys all spent significant time with Defendant attempting to communicate and to represent him to the best of their abilities.  The record also reflects Defendant's inability to engage in meaningful, appropriate, helpful interaction with most of his counsel.  For example, Warren described his relationship with Defendant as an "acrimonious play" and concluded Defendant's failure to communicate adequately with him was a "willing refusal."  The Court repeatedly recognized Defendant's deliberate failure to understand the Court when it attempted to advise him and noted: "If this is an example of how you deal with your attorney, I can understand why he's having difficulty."  Gov't Resp. to Am. Mot., Ex. 30 at 15.

Similarly, at the September 11, 2009, hearing the Court noted:

> My problem here, sir, is that you've now had
> two lawyers that you've told me you can't get
> along with.

> Mr. Kauffman is a perfectly courteous man.  I
> know Mr. Conry to be an extraordinarily
> experienced and personable individual.
>
> * * *
>
> Now, if you want someone who will treat you
> with respect -- and I don't in any way accept as
> fact that Mr. Conry did not.  But I also don't
> think there's any use in my trying to fight that
> battle.
>
> You need to commit to treating the lawyer
> with respect.
>
> * * *
>
> But there has to be a way for the lawyer and
> you to communicate.

Gov't Resp. to Am. Mot., Ex. 13 at 12-13.

On this record the Court concludes defense counsel spent
more than adequate time with Defendant personally, and Defendant
did not receive ineffective assistance with respect to his
attorneys' efforts to get to know and to communicate with
Defendant personally.

**IV.  Alleged failure to file written pretrial motions for
      discovery**

Defendant asserts he received ineffective assistance because
his attorneys failed to file written pretrial motions for
discovery.  The docket establishes Defendant is incorrect.  On
June 18, 2009, Kauffman filed a Request for Discovery that was a
broad-based, written discovery demand. Gov't Resp. to Am. Mot.,
Ex. 9.  On September 17, 2009, Warren filed a Request for
Discovery that included a similar broad-based demand for

36 - OPINION AND ORDER

discovery.  Gov't Resp. to Am. Mot., Ex. 15.  Warren also filed six other discovery-related demands with the Court. Gov't Resp. to Am. Mot., Ex. 16 (Request for Production of  Washington Search Warrant materials); Ex. 20 (Third Request for Production of specific DEA Exhibits); Ex. 21 (Fourth Request for Production of specific GPS Order); Ex. 23 (Fifth Request for Production for 15-day reports and specific materials relating to Pen Registers); Ex. 24 (Motion for Grand Jury Transcripts); Ex. 28 (Sixth Request for Production for ICE arrest records from California/Mexico border).

In addition, Warren notes in his Declaration that there was not any reason for him to seek an order of the Court with regard to discovery because the government honored all of Defendant's discovery requests.  Gov't Resp. to Am. Mot., Ex. 36, at 3-4.

Kolego also testified in his Declaration that he knew there was a continuing discovery demand and that he was unaware of any exculpatory or impeaching evidence that the government did not provide to the defense.  Gov't Resp. to Am. Mot., Ex. 35, at 2.

On this record the Court concludes defense counsel made numerous written pretrial motions seeking discovery.  Thus, Defendant did not receive ineffective assistance of counsel related to written discovery motions.

**VII. Alleged failure to investigate or to prepare Defendant's case for trial adequately**

Defendant contends Kolego did not have any incentive to and,

37 - OPINION AND ORDER

in fact, did not adequately investigate or prepare Defendant's case for trial because Kolego was retained on a flat fee. Defendant, however, does not provide any specific factual allegations to support his contention.  The Ninth Circuit has made clear that even to obtain a hearing, much less to prevail, on a § 2255 motion, "'the movant [must have] made specific factual allegations that, if true, state a claim on which relief could be granted.'"  *United States v. Withers*, 638 F.3d 1055, 1062 (9th Cir. 2011)(quoting *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984)).  In addition Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings provides a defendant making a § 2255 motion "must . . . state facts supporting each ground."  Defendant has not met that standard.

In addition, the Court finds Kolego conducted the trial with reasonable, professional zeal.  Kolego thoroughly cross-examined the government's witnesses against Defendant, attacked the credibility of the cooperating witnesses, and specifically addressed the government's evidence in his closing argument.

On this record the Court concludes Defendant did not receive ineffective assistance of counsel from Kolego with respect to Kolego's investigation, preparation, or litigation of Defendant's case.

## VIII. Alleged failure to subpoena and to interview witnesses requested by Defendant

Defendant alleges in his Amended Motion to Vacate that

38 - OPINION AND ORDER

Kolego did not subpoena or interview "prospective defense witnesses as requested by" Defendant.  Defendant does not identify any specific individual who he requested Kolego to subpoena or to interview or how any particular witness could have aided his defense.  In addition, Kolego testifies in his Declaration that he

> spoke with [Defendant] about prospective defense witnesses and he never asked me to subpoena or interview any witnesses.  [Defendant] told me that it was his understanding that he had no burden of proof, was presumed to be innocent and that he did not believe the witnesses against him were credible.

Gov't Resp. to Am. Mot., Ex. 35 at 1-2.

Finally, although Defendant made clear that he was quite willing and able to complain about counsel's alleged failures in the course of this matter, Defendant did not assert at any time before his Amended Motion that Kolego failed to subpoena or to interview witnesses identified by Defendant.

On this record the Court concludes Defendant did not receive ineffective assistance of counsel from Kolego with respect to the interviewing and/or subpoenaing of unspecified individuals who Defendant requested Kolego to interview and/or to subpoena.

## IX.  Defendant's decision not to testify at trial

Defendant alleges in his Amended Motion to Vacate that Kolego

> told defendant not to take the witness stand and testify at either trial or at sentencing as

> [Defendant] wanted to do in order to explain his
> limited role in the over-all drug conspiracy and
> that he was not, in fact or at law, a leader or
> organizer of the drug conspiracy whereas one of
> his co-defendants was far more culpable as a
> leader or organizer.

Def.'s Am. Mot. at 5-6.  Defendant's allegation is unsupported by

the record.  At trial the Court advised Defendant about his right

to remain silent or to testify.  After Kolego indicated to the

Court that Defendant intended not to testify at trial, the Court

engaged in the following exchange with Defendant:

> THE COURT:    I want to review with you
> certain of your constitutional rights, to confirm
> that you understand the particular rights I'm
> about to explain and what your choice is about
> them.
>
> Specifically, as I know you know, you have an
> absolute right to remain silent.  Which is a -- to
> say you have no obligation to testify at all.  No
> obligation to offer any evidence from you or
> anyone else.
>
> At the same time, however, you have an
> absolute constitutional right to take the witness
> stand in your own defense.
>
> And if you wanted to do so, after the
> Government rests, the next step would be for you
> to take the witness stand and take the oath to
> testify truthfully, and then answer all of the
> questions your lawyer put to you, to be followed
> by cross-examination by the Government's
> attorneys.
>
> Now, you have both rights:  The right to
> remain silent, and the right not to testify.
>
> Do you understand that?
>
> THE DEFENDANT THROUGH INTERPRETER COBLE: Yes,
> I do.

40 - OPINION AND ORDER

THE COURT:    I want you to be sure you understand it is your personal choice and not your lawyer's choice that matters here.

If you chose to testify, I would permit you to do that even if Mr. Kolego thought that was not a good idea.

Do you understand?

THE DEFENDANT THROUGH INTERPRETER COBLE: Yes, I do.

THE COURT:    Sir, do you wish to testify? Or do you wish to remain silent, as is your right?

THE DEFENDANT THROUGH INTERPRETER COBLE:  I'm going to remain silent.

THE COURT:  Thank you.  Go ahead and have a seat.

Gov't Resp. to Am. Mot., Ex. 34 at 1081-82.

At sentencing Defendant himself addressed the Court and, in short, argued he was being held responsible for drug quantities and sales that "were not [his]."  Gov't Resp. to Am. Mot., Ex. 5 at 42-43.  The Court addressed Defendant's argument as follows:

The defendant is held accountable under the presentence report for quantities of drugs that were the subject of the conspiracy crime for which he was found guilty.  His remarks today suggest he is persisting with the wrong belief that he cannot be held accountable for the drug quantities handled by others within the scope of the conspiracy of which he was a member.  That has been a recurring theme throughout this case.

* * *

But accurately, as the presentence writer has summarized, he is accountable for all of the drugs distributed and possessed with intent to distribute by anyone within the scope of his

41 - OPINION AND ORDER

> conspiracy.  That's the nature of conspiracy.  And
> the defendant is guilty of that crime, as found by
> the jury beyond any reasonable doubt.

Gov't Resp. to Am. Mot., Ex. 5 at 44-45.  The Court also

concluded Defendant "is the most culpable of the defendants I am

sentencing in this conspiracy.  He is a manager and leader.  He

is unrepentant.  He is a person who has not accepted

responsibility."  *Id*. at 46.

Finally, Kolego testifies in his Declaration:

> [T]he decision as to whether to testify or not
> rests with the client.  I never tell defendants
> not to testify.  Instead, I inform all defendants
> that the decision as to whether to testify or not
> is theirs and offer my opinion as to whether or
> not it is a good idea.  In [Defendant's] case I
> felt that subjecting himself to extensive
> cross-examination was probably not in his best
> interest but had [Defendant's] wished to testify
> he certainly could have.

Gov't Resp. to Am. Mot., Ex. 35 at 2.

On this record the Court concludes Defendant has not

established he received ineffective assistance of counsel with

respect to whether he should testify at trial and/or at

sentencing.

## X.   Claims involving actions by the government

Defendant also moves to vacate his sentence on the grounds

that

> a.   the government's attorneys failed to make a
> timely written disclosure or statement to the
> Court and defense counsel of the content of their
> file(s) and the files of investigating agencies
> with regards to Rule 16, Jencks Act and <u>Brady</u>

42 - OPINION AND ORDER

documents so this Court, defense counsel an
appellate court and the Oregon State Bar would
have the opportunity to decide whether the rules,
statutes and case law had been complied with
pre-trial, at trial, at sentencing, and/or on
appeal; and

b.    failed to disclose the overall extent of the
drug conspiracy and other supervisors, leaders,
managers, organizers, and high level personnel in
the drug organization in order to provide . . .
[Defendant] for defendant to rebut the
government's arguments at sentencing:

1)    that [Defendant] should have a four or
more level enhancement as a leader or
organizer,

2)    that [Defendant] was anything more than
a street level dealer of drugs assisted by
family and acquaintances, and/or

3)    that [Defendant] should receive any
sentence greater than 14-15 years in light of
18 U.S.C. § 3553 and the sentencing of his
drug supplier.

Def.'s Am. Mot. at 6-7.

Defendant's allegations are unsupported by the record.  The

record reflects the government provided Defendant with 19,899

Bates-numbered documents or exhibits in 34 disseminations.

Defendant made multiple discovery motions, and Defendant's

attorneys testified in their Declarations that the government

complied with all discovery requests.  *See* Gov't Resp. to Am.

Mot., Ex. 36 at 2-3 ("I filed numerous discovery motions,

including grand jury transcripts, and I received all discovery

sought in this case.  It was unnecessary to seek an order of the

court because all of my discovery requests were honored by the

43 - OPINION AND ORDER

government."); Gov't Resp. to Am. Mot., Ex. 35 at 2 ("There was a continuing demand for discovery when I was retained in [Defendant's] case and am not aware of any exculpatory or impeaching evidence that was not provided for the defense."); Gov't Resp. to Am. Mot., Ex. 37 at ¶ 6 ("Over the three months that I represented [Defendant], I had received over 16,000 pages of discovery in digital format.  As I recall, that production included numerous investigation reports, wiretap transcripts as well as audio files.").

The discovery produced to Defendant described a broad network of drug dealers, including many who played a role in the charged conspiracy or had connection with the conspirators at the time of the Indictment.  For example, at trial the government adduced evidence from a cooperating and charged witness, Nelson Borrayo, about his role and that of his boss, Pedro Govea Maldonado, in supplying Defendant and his organization with drugs.  Prior to trial the government provided over 1,000 pages of discovery relating to Borrayo and Maldonado.  The government also provided significant discovery about Jose Duarte, who is Defendant's brother and who ran the enterprise in Portland in the summer of 2008 through November 2008 when Defendant returned to Portland from Mexico and took over control of the enterprise and essentially exchanged places with Jose Duarte who returned to Mexico.

44 - OPINION AND ORDER

On this record the Court concludes Defendant has not established that the government failed to make timely disclosures or that it failed to disclose the overall extent of the drug conspiracy and the roles of other leaders and supervisors.

The Court, therefore, denies Defendant's Motion to Vacate or Set Aside Sentence and Defendant's Amended Motion to Vacate or Set Aside Sentence.  Moreover, because the legal issues raised in Defendant's Motion and Amended Motion are clearly established, the Court does not see any basis to grant Defendant a certificate of appealability.

## **CONCLUSION**

For these reasons, the Court **DENIES** Defendant's Motion (#367) to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 and Amended Motion (#382) to Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 and **DECLINES** to issue a certificate of appealability.

IT IS SO ORDERED.

DATED this 16th day of August, 2013.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge


45 – OPINION AND ORDER